Thank you. May it please the Court. Judge Barksdale, the parties here agreed to proceed in front of Magistrate Judge Mitchell by agreement for scheduling reasons? I understand that, but it was for scheduling reasons? Yes, Your Honor. To get a quicker resolution? In part to get a quicker resolution, in part just because the parties' schedules and schedules are different, but it was for scheduling reasons, and it was for scheduling purposes. Not like in some districts where they're just trying to avoid a particular district judge. That wasn't the case here. No, Your Honor. I don't believe so. Although perhaps in retrospect we might have been happier. Before diving into the technical language of the policy here, which is inevitable, I'd like to begin with two broader points that I think frame the issue in this case. The first and most important is that AXIS is not being asked to assume any liability below its $10 million attachment point. We are not suggesting that our settlement with Zurich has increased AXIS's liability by a single dime. As we interpret the AXIS policy, AXIS is placed in exactly the same position, no better and no worse off than if Zurich had actually paid the full $10 million. Well, I was going to ask you that very question, because I understand we're looking to see if there's more than one reasonable explanation of the clause in issue. But just as a matter of common sense, why would it be reasonable for an excess carrier, which has agreed to pay $10 million, why would it be reasonable for the excess carrier to have to step in when the primary carrier has not paid to the limits? And I know, Chief Judge Stewart's opinion, that's in the clause, limits. I know we don't have that here. But just as common sense, why would that make sense that the excess carrier is standing there, the primary says to the insured, well, you've got $10 million in coverage with us, but there's no coverage, and so just to get rid of you, we'll pay you $2 million. Why does that make sense for the insured to then come in and say, well, then we'll pay $8 million, now the excess has to come in? I don't follow the common sense of that. Judge Barksdale, let me try common sense from a different perspective, which is that the risk that the excess carrier has agreed to assume in its AXIS policy is a loss to the primary carrier. In this case, AXIS has said, Zurich, or perhaps MRMC, is going to be responsible for the first $10 million of coverage. AXIS only becomes liable once the lost MRMC exceeds that $10 million. So from AXIS's perspective, if MRMC suffers an $11 million loss, it is only liable for $1 million. Now, as we interpret the policy, it shouldn't matter to AXIS what happens to that first $10 million. If MRMC incurs a covered loss for $11 million, why should it matter to AXIS whether Zurich pays that full $10 million to MRMC, whether Zurich ... Because, again, just speaking common sense and doing business, perhaps because MRM, AXIS's position is, we are excess to your coverage with another company, and that other company hasn't paid that $10 million yet. So why do we need to step in? Well, yes, Ron, I think I understand that's their position here. But from their perspective, as long as they are not being asked to assume any portion of MRMC's liability for a loss below $10 million, they aren't any worse off. If AXIS is only being asked to pay $1 million, it should not matter economically to AXIS whether MRMC paid the full first $10 million itself, or whether Zurich paid all of that $10 million, or whether Zurich paid half of it and MRMC paid the remaining half of it. In all of those circumstances, assuming AXIS . . . I'm assuming MRMC has suffered an $11 million covered loss, AXIS should be liable for exactly the same amount, and that's $1 million. We think that's what the AXIS policy provides for here unambiguously. And if we can turn to the policy language, I think what you see there is . . . excuse me . . . the second sentence of Section 5C. Before you get to that policy clause, understand, if we hold that the policy is ambiguous so that therefore you have coverage, you, MRMC, on remand, what are the other collateral issues that have to be . . . in your brief, you reference other issues remain. What are those? There are several. I believe it involves the insured persons versus insured persons clause was in dispute at one point. There's a question of when the claim arose. There's a question of whether MRMC had notice of claims against it from before this policy period when it was actually acquiring this excess coverage. So there are a number of additional coverage . . . Other coverage issues. Yes, Your Honor. A number of other coverage disputes, which we're not asking this Court to address. Well, I understand that, but that's what the disputes are, simply more questions of coverage. Yes, Your Honor. All right? So, and Judge Barksdale, going back to your earlier question, Axis does admit that at least in some circumstances it will be responsible for coverage under the excess policy even when Zurich has not paid the full $10 million. Axis acknowledges that if Zurich paid, say, $5 million of its policy limits and then became insolvent, that Axis would still be liable to provide excess coverage, again, only above its attachment point. Axis recognized that before the district court, and Axis admitted that again in its briefing in this case. So what's the total liability that is owed here, $80 million, or what is . . . That is one of the other disputes, and I'm sorry for not listing that. We believe it is approximately $80 million. I think Axis has taken the position that there's actually been no loss whatsoever. So we're still . . . one of the points in contention is whether we have actually suffered a loss that would trigger these policies. But from our perspective, and we think for the purposes of this appeal, you should assume that the law succeeds the combined limits of all of the D&O policies. So if the first insurance company pays only $6.5 or $6 million, whatever it is, and we say that's okay, does the second insurance company ever have to pay out anything? Because the first insurance company never reached its $10 million. So even though there might be liability for $80 million, they'll never have to pay anything until and unless the first insurance company pays $10 million. So their second insurance company is totally off the hook? That is Axis's position. Their view is that by settling with Zurich, we have forfeited coverage under the Axis policy and can never receive any of the policy coverage that we bargained for. And we think that's one reason there's a particular need for clarity in these sorts of provisions, that a policyholder who is contemplating a settlement with the primary carrier needs to know if that's going to result in a forfeiture or loss of all of the Axis coverage. And so even beyond the ordinary interpretation of insurance policies in favor of the insured, this is a situation where we think the insured absolutely needs to have fair warning if that sort of settlement is going to cost them all of their Axis coverage. Isn't it generally the case? I mean, I know of situations in which, you know, the Axis carrier has been asked to kick in, you know, in order to get the underlying amounts, blah, blah, blah, so they don't have to pay more. I mean, lots of that stuff happens, not necessarily because of policy language, but because. Other situations, Katrina, whatever, Axis carrier just comes in and says, look, this is a gillion dollar claim, here's our check, leave us alone. So, I mean, the point is, but the point I'm getting to is often isn't this bargained for in the negotiation of the contract and the premiums, et cetera. In other words, the premiums, the payment, is the understanding that it's not triggered until, you know, you reach the limit. So it kind of comes back to the original question. I mean, that to me is sort of the heartland that I understand. So I'm trying to peg in why is the argument that the language here is so unique that the norm, as we've talked about, is not the norm, because this particular language, from your standpoint, augurs up a different circumstance. Is that . . . Well, yes, Judge Stewart. I would say I think we win under the language of this policy. Now, I think I disagree with you about what the norm is. Okay. We talked about the cases in the briefing, and we think a number of them have . . . Yeah, well, I don't want to send you on a sidetrack about that, but it was sort of coming at it a little bit different, but the same angle, Judge Barks, ordinarily we think of excess carriers as just that, excess carriers. So where there's an argument about a settlement, particularly, with something less than that, it takes some extra effort to understand the argument of why it's triggered. And I guess that . . . maybe that'll send you into what the main thing you want to show is why you win under the language as it exists versus whether or not we have to find a language ambiguous in order for you to prevail. Certainly. And, actually, before I jump, hopefully very quickly, into the language of this policy, I would just like to point out how easily Axis could have written this unambiguously. There are any number of cases cited in the briefing in which excess carriers have imposed these conditions unambiguously. Probably the best example is the Goodyear tire and rubber case from the Sixth Circuit. Coverage shall attach only after the primary carrier shall have paid in legal currency the full amount of the underlying limit. It would have been perfectly easy for Axis to have used the same language as its competitors, and it simply hasn't used language with that degree of clarity in its policy. What I'd like to focus you on, though, in the remaining four minutes of my opening argument, is the second sentence of Section 5C. We think that speaks exactly to the situation we're in now. If the underlying insurer, that is Zurich, fails to make payments under such insolvency of such underlying insurer, then the insured, MRMC, shall be deemed to have retained any such amounts which are not so paid. We understand deemed to have retained to mean those amounts will be treated as a self-insured retention. This is an extraordinarily broad clause. Far more typically, you see what was used in the steadfast policy in Citigroup, which refers to a failure to pay as a result of insolvency, bankruptcy, or liquidation. You tend not to see these that say, failed to pay for any reason whatsoever. When you look back to Section 1 of the Axis policy, you'll see that there are two results from treating the unpaid amounts as a self-insured retention. The first is that it changes who pays them. The insurance company, the primary carrier, doesn't pay a self-insured retention. That's an amount that is always paid by the insured. And then second, when you look at the second sentence of the second paragraph of Roman I of the policy, it says that Axis shall only pay excess of any retention or deductible amounts. So to use the $2 million example, assume that MRMC suffered an $11 million loss and that Zurich paid $2 million and didn't pay any more, failed to pay the rest as a result of insolvency, as a result of settlement, or for any other reason. Zurich's payment would reduce MRMC's loss to $9 million. The $8 million unpaid by Zurich would be deemed to have been retained by MRMC. That is treated as a self-insured retention. And so Axis would pay the excess of this retention amount. Axis would again be liable for $1 million. And this is exactly the amount that Axis would be liable for if Zurich had paid the full $10 million of underlying policy limits. Now, I mentioned Axis has acknowledged that if Zurich were to be insolvent and paid only a portion of its policy limits, that Axis would still provide coverage under its excess policy. But what Axis has not done is provided a textual explanation of how that works under the policy. They have disagreed with us about the connection between the deemed retention in Section 5C and the retained language in Section 1, but they haven't offered any other alternative meaning for what that second sentence of Section 5C, and in particular what the deemed retention language in there, might mean. How's the language of this policy compared to the language that was in the Citigroup case ruled on by this Court? Can you distinguish the language between our case law and the language in this case that makes this different? Yes, Judge Prado. So three of the policies in Citigroup use the sort of crystal clear language that I've given an example of. They all provide that a total amount of the underlying limits need to be paid in legal currency by the insurers. The fourth policy on which Axis primarily relies is the steadfast policy. And what this group said in the opinion was that there is exhaustion of the limits of liability of such underlying insurance solely as a result of payment of loss thereunder. That's very different than the phrase we have here, actual payment under such underlying insurance. This Court held that payment of loss required payment by the underlying insurer, and it held that the payment needed to be paid in full limits of liability. But the easiest distinction, and I'm sorry for getting to it last, is that there is no equivalent of Section 5C in this policy for the steadfast policy that was discussed in Citigroup. Well, Mr. Peterson, Madam Clerk, give Mr. Peterson two additional minutes on the clock. We absorbed a little of it, what the question is, and I'll do equally on the other side if you need it. But go ahead, you've got two minutes. Well, thank you, Judge. As I mentioned, Judge Prado, the steadfast policy there didn't talk about the underlying carrier's failure to pay for any reason whatsoever. It had the more traditional fails to pay as a result of insolvency, bankruptcy or liquidation language. One of the cases that this Court relied on in Citigroup is a California case called Comerica, and it looked at a similar provision that had limited circumstances in which the insurer was allowed to make a payment, and concluded that the possibility of less than full payment by the underlying carrier had occurred to the parties, and that they chose intentionally not to include settlement in the list of circumstances in which the insurer could make the payment itself. And we think applying that reasoning here leads to a very easy result. Here, Axis and MRMC apparently did contemplate the failure of Zurich to make payments under the underlying policy for any reason whatsoever, and they agreed that any amounts unpaid by Zurich would be deemed to be a self-insured retention by MRMC. And so circling back to where we began, if MRMC has suffered a loss that exceeds the attachment point, Axis will face no more and no less liability as a result of a settlement with Zurich. It will still only be exposed to MRMC's losses that exceed the attachment point. We think we've offered the best reading of the contract, but at least a reasonable one, and we'd urge you to reverse on this issue and send it back for consideration of the other coverage disputes. All right. Thank you, Mr. Peterson. All right. We'll hear from Axis. Mr. Heineman? Good morning, Your Honors. My name is Jeffrey Heineman. I'm counsel to Axis Insurance Company, the appellee here. This morning I'd like to try and accomplish two things. First, I'd like to walk Your Honors through the provisions of the Axis policy in order to show that when the underlying insurer, here Zurich, to pay all of its underlying limits in order for appellant to seek coverage under the Axis policy. Second, I'd like to spend a few moments talking about this Court's decision in Citigroup, which is controlling precedent. Like the four policies in Citigroup, which amongst themselves all have different policy language, the Axis policy likewise, when you read the language, makes clear that a settlement by the insured with an underlying insurer for less than its limits forecloses the ability to satisfy the terms of the insuring agreement. For purposes of our argument this morning, we provided the Court with two one-page handouts. The first is a summary of the relevant provisions of the Axis policy. The second is a summary of the relevant provisions of the underlying policy, the Zurich policy. If we turn to the Axis provisions, and particularly Section 1, this is the insuring agreement, and it provides the preconditions necessary for the insurer to satisfy, to trigger the policy. The insuring agreement obligates Axis to provide coverage only after all applicable underlying insurance has been exhausted by actual payment under such underlying insurance. And if we slide down to Section 2, underlying insurance is defined as the insurance scheduled in endorsement number one to the Axis policy. And at the bottom of the page is Schedule 1, that is the Zurich policy with a $10 million limit. And the reason it refers to a schedule is because this is an excess policy. And in this instance, it's excess only to a primary policy. But this policy could have been the fourth excess insurer in a tower. That's why it uses that phrase. So if you now insert and use that language, clearly the Axis policies insuring agreement requires that it provides coverage after all applicable underlying insurance, the Zurich policy, has been exhausted by actual payment under such underlying insurance, under the Zurich policy. It is the appellant's claim, and only $6.5 million, that in fact the underlying insurance is exhausted. That is not a reasonable interpretation of this insuring agreement for a number of reasons. First, let's focus on the word exhausted. As the appellant's brief notes, the plain meaning of the term exhausted is to consume entirely or use up. Here, Zurich has paid only 65% of its limits. Clearly paying 65% of its limits is not consuming the entire Zurich policy. Second, appellant ignores the word all. There's a reason why the word all is in the insuring agreement. Only after all applicable underlying insurance has been exhausted. As this court noted in Citigroup, the words all, total, and full amount have to be given meaning, since Texas courts require a court to read all parts of a policy so that all provisions are given meaning and no provisions are rendered inoperative. Additionally, if we move down further to actual payment under such underlying insurance, it is the appellant's contention that since they settled the underlying case for more than $10 million, that that settlement with the $6.5 million of the Zurich payment exhausts the Zurich policy. Under such underlying insurance is included here. Okay? That's under the Zurich policy. So this insuring agreement doesn't permit an insured and an underlying insurer to jointly exhaust the underlying insurance. There's a reason why under such underlying insurance is included in the insuring agreement. It's to ensure that it is the underlying insurer that pays. And in response to a question you asked earlier, Judge Barksdale, you actually have it right. It is access's expectation that the underlying insurer whose policy language it's following will stand up and defend its language. That if it believes there's no coverage for a claim, it will not simply cut and run. Pay $2 million, buy off the insured, and leave the excess insurer standing there to now defend its language. We bargained for Zurich to stand there with our insured. Okay? And that's why the insuring agreement is very specific in the language it's used. I would agree that if the insuring agreement simply said the access policy is triggered after underlying insurance is exhausted, we would be having a different conversation today. But there's a reason why this policy uses all applicable insurance and under such applicable insurance. And if we now turn to a number of the other provisions, what we see is a continuing consistency in how the access policy operates. Section 3 provides how the policy will attach and apply and requires that the underlying insurance will be maintained in full effect except for any reduction or exhaustion of the underlying limits as provided in Section 4. Section 4, which is also on the handout, are the only to recognize the underlying erosion of the primary policy. A, if the underlying limits are partially reduced solely due to actual payment under the underlying insurance, there's that phrase again, this policy shall continue to apply as excess insurance over the remaining underlying limits. So if, for instance, there's a claim that settles for $4 million, we'd have a reduction in limits of $4 million. The access policy would then sit excess to the remaining $6 million, and if that remaining $6 million is paid in a second claim during that policy period, then as that policy drops down, once the $6 million and the $4 million are paid, then the access policy will become primary. And that's exactly what's provided in B. If the underlying limits are wholly exhausted due to actual payment under the underlying policy, shall continue to apply as primary insurance with respect to the applicable insurance products. Now we know here we have a $6.5 million payment. We are within the purview of Part A. There has been a partial reduction. The access policy now sits excess to the remaining $3.5 million in limits of the ZURC policy. Until that $3.5 million is paid, the access policy can't be triggered, and we know that the $3.5 million will never be paid because they were absolved of their obligation to pay the $3.5 million by the settlement they entered into with the insured. Let's just spend a couple moments on Section 5, which shows even more consistency. First of all, Section 5 begins with the claim not covered by the underlying insurance. This is significant not so much for the analysis we're having right now, but for the cases the appellant cites to this Court, which we can talk about in a moment. The sentence then goes on to say that the access policy shall drop down only to the extent that payment is not made under the underlying insurance solely by reason of exhaustion of the underlying insurance through payments there under. Consistency. We start in the insurance agreement requiring actual payment under such underlying insurance. We go to the reduction clause. We're talking about actual payments under the underlying insurance, and here we're talking about the access policy drops down only when the underlying insurance has been exhausted by actual payments there under. So once again, consistency. Access looked to have the entire Zurich policy paid before it would be obligated to do anything. Now, the maintenance clause, which is traditional in excess insurance, also provides protection to the insured. It really serves dual purposes. It protects the insurer by not having it drop down unless the underlying insurance has been properly paid, and it protects the insured, as the trial court noted, in the limited exception when an underlying insurer fails to pay. You've heard Mr. Peterson argue that here, Zurich failed to pay, and it is entitled to pay. There has been no failure of Zurich to pay. Fail. To not do something we're obligated to do. The plain meaning. How could Zurich have failed to pay when it entered into an agreement with appellant and the appellant absolved it from any obligation to pay anything other than $6.5 million? There's a district court in Virginia, as you know, that said that the exact language in this policy was ambiguous and distinguished it from our city group case that said the language was clear there. The problem with this insurance was it didn't have a clear definition of what actual payment meant. How do you get around that opinion? Was it incorrect? Can it be For a couple of reasons, I believe it is distinguishable, Your Honor. First, I actually think the decision in the Eastern District of Virginia misread the insuring agreements in the policies that were part of the city group case, because it cited to only one of the policies and indicated that that was clearer language. It didn't pay any attention to the steadfast policy, which I believe is analogous to the language in the access policy, because the steadfast policy, use the phrase, has been reduced or exhausted by payments for losses. And what this court did in city group was looked at the phrase payment of losses and looked to the Comerica case, which was actually an Eastern District of Michigan case, and said that the Comerica case analogized the phrase payment of losses to actual payment. And that meant that the underlying insurance had to be actually paid by the underlying insurer. And here, access actually used the phrase actual payment. We didn't say payment of losses. We said actual payment under such underlying insurance. But I think the most critical distinction with the Maximus case is the Maximus court under Virginia law applied public policy considerations, which favor settlements as a factor to be utilized in a settlement. Maximus does not allow a court to consider public policy considerations when analyzing contract language. Contract language has to be read as a whole according to its plain meaning. So I actually think the Maximus case is both wrong and distinguishable. And I would note one other thing. You'll notice in a footnote in the Maximus case that what had a lumberman's policy that had the exact same insuring agreement language as this access policy does. And the only way the court could distinguish how it was coming out with a different result than the court in New York did was to say that they were deciding the decision under Virginia law. So I don't think Maximus, I actually think reliance on Maximus is misplaced. I think it is a distinguishable case, and I believe they got it wrong because for the reasons I've just said, I think this policy makes very clear that the underlying insurer actually has to be the one making the payments. Was that case appealed? I guess it was not.  So from the perspective of access, we believe the policy language is very unambiguous. It required payment by ZURT of the total $10 million in its limits. Since that has not happened under the controlling authority of Citigroup, and again, I believe the most relevant provision is the steadfast policy in Citigroup. We believe that the appellant's ability to trigger the access policy has been foreclosed. I want to just comment on a couple other things. First, while it's true that the steadfast policy in its maintenance provision does not use the phrase for any reason whatsoever, the St. Paul policy in Citigroup actually does use that terminology. It specifically says that the risk of uncollectability of the underlying insurance in the whole or in part, whether because of financial impairment or insolvency of any underlying insurer or for any other reason, is expressly retained by the insurer. So in fact, this court in Citigroup did address a policy where the maintenance provision used the very same language. And again, this goes back to the question of, first, the language was clearly dealt with in Citigroup, but second, we don't even have a failure here. I am confident that if you asked ZURT if they failed to pay $3.5 million, their answer would be absolutely not. We have no obligation to pay the $3.5 million. And that's the point. This is a saving clause for the insured where beyond their control an insured simply does not pay. That's not our facts here. The reason $3.5 wasn't paid was because the appellant said to themselves, let's get $6.5 million as opposed to nothing. And if the price to be paid for that is we give up $3.5 million, so be it. And that's exactly what happened here. They settled, they released ZURT from the $3.5 million. As far as the remaining cases the appellant relies upon, I think what the most important takeaway from those cases is, is how important the language of the policy is. You will notice that those cases have different insuring agreements, different definitions, different provisions. More important than anything else, most of those cases are umbrella policies. And umbrella policies are a completely different insurance product than an excess product. An excess insurance policy follows form to an underlying policy, and as I noted in 5C, does not provide coverage for any claim not covered by the underlying insurance. Umbrella policies are much broader. Umbrella policies provide coverage many times above several different lines of coverage. How many of us have a personal umbrella policy? That personal umbrella policy sets access to our automobile coverage, it sets access to our homeowner's coverage, and potentially other forms of coverage. More importantly, however, umbrella coverage also provides coverage for damages that are not even covered by the underlying insurance. So you will find in your automobile policy you have no coverage for false arrest. In your homeowner's policy you have no coverage for false arrest. Your umbrella policy provides coverage for false arrest. And that's why when you look at the cases that were relied upon, including this Court's decision in W&T, the triggering language turns on the retained amounts, or the retained limit, or the ultimate net loss, which is defined to be the amounts the insurer or both are held liable for or have settled for, because all umbrella policies are looking for is to make sure that they're paying at a certain level and not who actually paid below. That's why those decisions all come out differently, because it's completely different insurance. So from the perspective of access, we believe that the language — There's a different — Excuse me. I'm sorry. There's a different bargaining, presumably. I mean, the premiums are greater on an umbrella policy because you're bargaining for coverage of a wider spread of liability, right? That's correct, Your Honor. That's correct. So unless the Court has any other questions — I have one question, and I know this is — again, I'm just — I know this isn't something that we actually could consider, but it would be helpful to better understand. Why is the language here, all applicable underlying insurance with respect to the insurance product has been exhausted by actual payment? Why is it — what would motivate the writer of a policy not to include up to its limits or something like that to make clear that the policy limits have to be paid? Because the term underlying insurance includes multiple policies. And as you can see in the definitions, underlying insurance are the scheduled products. The reason it uses the term products is, as I said earlier, this could be a fourth-layer excess policy, which would mean there would be a primary policy and three individual excess policies. So that's why it's using the phrase all applicable underlying insurance, which in a fifth excess situation would be all four policies have been exhausted by actual payment under those four policies. That's why it uses the term underlying insurance. Thank you, Your Honors. All right. Thank you, sir. Back to you, Mr. Peterson. So does this mean if you did not use your primary limit of 20 minutes, you're not entitled to your excess of two minutes? That's correct, Your Honor. Thank you. Judge Barksdale, from the Citigroup opinion, let me suggest some alternate language that excess should have used. My friend quoted a portion of the St. Paul policy. He did not quote the St. Paul's insuring agreement. Coverage attaches when the total amount of the underlying limit of liability has been paid in legal currency by the insurers of the underlying insurance as covered loss. It tells you the amount of the payment and it tells you who must make the payment. The federal insurance policy from Citigroup. After all underlying insurance carriers have paid in cash the full amount of their and have provided for this unambiguously. Access simply didn't do so. Now, I'll say I have to confess I'm a little bit confused because standing here right now, I still do not understand my friend's interpretation of the policy. We offered you a reading that harmonizes Section 1 and Section 5C of the policy. And the first words out of his mouth, I believe, were that access provides coverage only where Zurich has paid the full But as he admitted later in the argument, that is not always true. Look at page 20 of Access' brief. It recognizes that insolvency is a circumstance under which the underlying insurance does not require payment by the underlying insurer. They acknowledge that this bright line rule they're urging you to adopt, that Zurich always has to pay in full, is simply not true. They say there are circumstances in which Zurich doesn't make full payment in which access still provides excess coverage. Now, they say that's limited to insolvency. They say that fails to pay for any reason whatsoever is, I think the words they used were limited to where there was an obligation to pay. That's not quite what But why does that carve out? I don't understand why that carve out proves the point you're trying to make. I mean, acknowledging that there could be some exception, why are you Because Judge Stewart, what they haven't explained is how that exception is consistent with Section 1 of the policy. Now, maybe what they're saying is Section 5C is just an exception to Section 1. And it just, on its face, provides coverage in circumstances where Section 1 doesn't. I think it's difficult to say that's true just looking at the text of 5C. We've explained how the deemed retention in Section 5C interacts with the insuring agreement in Section 1. And if they acknowledge that they will provide coverage when Zurich fails to pay for any reason whatsoever under the underlying insurance, which I think they do, I'd suggest this should be an easy case for the We were looking at our settlement with Zurich. We did not make the decision to abandon our excess coverage. We looked at the access policy that said we are permitted to treat as a self-insured retention any amounts that Zurich fails to pay. We looked at the Maximus decision, which provides a detailed, in-depth analysis of this access policy under Virginia law, which to the best of my knowledge is consistent with Texas insurance law, and concluded that this access insurance policy still provided coverage even though Zurich did not pay the full limits of its underlying policy. There's nothing in the insuring agreement, the hopelessly ambiguous phrase, actual payment under such underlying insurance that requires payment only by Zurich. I'd also turn the court to Section 4A of the access policy, because I'd like to point, I'm sorry, 4B of the access policy, because it refers to the underlying limits being wholly exhausted solely due to actual payment under the underlying insurance. If you look at the definition of underlying limits in Section 2K, you'll see that underlying limits includes both the limits of liability for the underlying policyholder and the uninsured retention for deductible. So what that tells us, if the underlying limits, including the retention, can be exhausted by actual payment under such underlying insurance, that tells us that payments by MRMC are part of actual payments under such underlying insurance. At the end of the day, if MRMC's interpretation of this policy is reasonable, it should govern. Access has not provided you with the only reasonable interpretation of this policy. They have not, as I suggested in my opening argument, given you a textual explanation for how they think Section 5C of the policy works. They simply say, well, we think it's limited to insurance. The district court has said, well, it means failure to pay at no obligation, or I'm sorry, at no fault to MRMC, and we think that broad phrase should be given its meaning. Fails to pay for any reason whatsoever. We would urge you to reverse. Thank you. All right. Thank you, counsel. Thank you, counsel from both sides for the briefing and argument. This completes the cases we have for argument this morning. They will be in recess until 9 a.m. tomorrow. Thank you. Thank you.